IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2018

## TINA NELSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lauderdale County**
No. 9132    Joe H. Walker, III, Judge

_____

### No. W2017-00343-CCA-R3-PC

_____

A jury convicted the Petitioner, Tina Nelson, of first degree felony murder committed during the perpetration of aggravated child abuse and of the underlying felony of aggravated child abuse. She petitioned for post-conviction relief, asserting ineffective assistance of counsel, and her petition was denied. On appeal, the Petitioner alleges that she is entitled to post-conviction relief because her trial counsel failed to properly investigate her case or present witnesses, failed to move for a severance, failed to properly challenge testimony that she showed no emotion, and failed to establish that her mental impairment prevented her from assisting in her own defense. After a thorough review of the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Scott A. Lovelace, Ripley, Tennessee, for the appellant, Tina Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

### Trial

The Petitioner's convictions stem from the death of her two-month-old daughter on May 11, 2011. *State v. Gregory Nelson and Tina Nelson*, No. W2014-00494-CCA-R3-CD(C), 2015 WL 2128598, at *1 (Tenn. Crim. App. May 5, 2015), *perm. app. denied* (Tenn. Sept. 21, 2015). The victim sustained severe injuries, including brain hemorrhages, retinal and optic hemorrhages, and numerous broken ribs in various stages of healing. *Id.* at *1. The Petitioner, who has an IQ of 53, and her husband, Mr. Gregory Nelson, were tried together and both convicted of first degree felony murder and aggravated child abuse. *Id.*

The victim was born prematurely, weighing a little over three pounds at birth, and she remained in the hospital for approximately two weeks. *Id.* at *4-5, 9. The Petitioner and Mr. Nelson could not drive, and they did not visit the victim in the hospital until informed by the Department of Children's Services ("DCS") that they would not be permitted to take the victim home unless they visited and bonded with her. *Id.* at *5. The victim suffered from intrauterine growth retardation, and during her hospital stay, she was given a cranial ultrasound and an MRI which showed a "[c]ontour irregularity," which "may be an unusual location for hemorrhage." *Id.*

The Petitioner and Mr. Nelson met numerous times with a DCS employee, Ms. Zandra Carter-Mann, regarding the welfare and care of the victim and her older sister. Ms. Carter-Mann testified that Mr. Nelson had become aggressive with hospital staff and verbally aggressive to DCS and school employees. *Id.* at *5-6. The Petitioner followed Mr. Nelson's occasional orders to refuse to talk to Ms. Carter-Mann, and she defended his aggressiveness. *Id.* at *6. Ms. Dawn Hemby, a youth services officer with the Lauderdale County Juvenile Court, also testified that the Petitioner was "bullied by" Mr. Nelson. *Id.* at *8-9.

The State presented witnesses who testified about the victim's condition prior to her death. On April 20, 2011, the Petitioner and Mr. Nelson's older daughter had a pending truancy case, and Ms. Kim Coffee, an employee of the Lauderdale County Juvenile Court, testified regarding the victim's well-being at the time of a hearing related to the truancy case. *Id.* at *7. The victim had a red spot on her eye and "just stared into space" rather than interacting with those around her. *Id.* The victim was outside with her family for two or three hours dressed only in very lightweight clothing and a light blanket despite the cold. *Id.* The Nelsons told Ms. Coffee that they did not have transportation

and were afraid they would miss their ride. *Id.* Ms. Hemby confirmed Ms. Coffee's testimony that the Nelsons were outside in the cold with the victim, who appeared "[a]lmost lifeless" and had a blood spot on the white of her eye. *Id.* at *8. Ms. Coffee and Ms. Hemby urged the family to consult a physician regarding the victim. *Id.*

The Petitioner and Mr. Nelson took the victim to the pediatrician four times after her discharge from the hospital. *Id.* at *9. On at least one occasion, Mr. Nelson told a social worker at the health department that the victim was breathing strangely and spitting up. *Id.* On April 28, 2011, after the Nelsons were told by Ms. Hemby and Ms. Coffee to check on the red spot in the victim's eye, the Petitioner told a social worker that she had made a doctor's appointment for the victim but that it was too cold and rainy to take the victim and that she would reschedule the appointment. *Id.* at *9-10.

Mr. Nelson's brother, who was also intellectually disabled, stayed with the Nelsons for a period of time, along with his girlfriend and his girlfriend's two children. The defense posited that Mr. Nelson's brother or R.C., the twelve-year-old son of Mr. Nelson's brother's girlfriend, might have been responsible for the victim's injuries. The evidence showed that relations between the Nelsons and Mr. Nelson's brother were generally strained, and the Nelsons believed that Mr. Nelson's brother had told DCS that they were abusing their older child. *Id.* at *8. Ms. Coffee testified that she received an anonymous call that the Nelsons were physically abusing their older daughter, but a welfare check revealed no injuries on the child. *Id.* Ms. Coffee also witnessed Mr. Nelson yell and act "out of control" regarding the incident, and he accused his brother of fabricating the report. *Id.* Ms. Hemby confirmed that the report appeared unfounded and that the child, who was not with her parents at the time, blamed her uncle for the report. *Id.* at *9.

Mr. Nelson testified at trial that the victim injured her head when R.C. pushed the Petitioner down while the Petitioner was holding the victim. *Id.* at *12. He also testified about a time that he had left the victim alone with his brother. Mr. Nelson heard the victim crying from another room, and when he entered, his brother was leaning over the baby and "told him to 'get [his] damn kid.'" *Id.*

Mr. Nelson testified that on the day of the victim's death, the Petitioner was outside waiting with their older daughter for the bus, and the Petitioner had the telephone. *Id.* at *13. Mr. Nelson remained inside with the victim, who suddenly spit up. *Id.* at *12 Mr. Nelson suctioned the victim's mouth and nose and saw her turn pale and then blue. *Id.* Mr. Nelson attempted to perform CPR on the victim, and once the Petitioner came in, Mr. Nelson called 911. *Id.* He testified that the victim's rib fractures could have been caused by CPR. *Id.* at *14. According to Mr. Nelson, the ambulance took an hour to arrive. *Id.* at *13. Mr. Nelson testified that the Petitioner also accidentally bumped the

victim's head on a doorknob. *Id.* He denied injuring the victim in any way, and he testified that the Petitioner would not have hurt the victim. *Id.* He claimed never to have been alone with the victim. *Id.*

The Petitioner also testified at trial, and she denied hurting the victim or seeing anyone else hurt the victim. *Id.* at *19. She confirmed that R.C. knocked her down while she was holding the victim, but she could not say whether the victim sustained serious injuries in the fall. *Id.* She likewise testified that she bumped the victim's head on a doorknob but stated it did not leave a mark. *Id.* The Petitioner recalled seeing Mr. Nelson's brother pick up the crying victim, and she testified that when she asked what was wrong with the baby, Mr. Nelson's brother said he was getting tired of hearing her cry. *Id.* at *20. She acknowledged that the victim cried constantly. *Id.*

The Petitioner testified that she was waiting for the school bus with her older daughter on the morning of the victim's death. *Id.* at *21. The Petitioner said that the victim died while the Petitioner was outside, that Mr. Nelson attempted to perform CPR, and that she performed CPR on the victim while Mr. Nelson called 911. *Id.* The Petitioner explained that there was a delay in calling 911 because she had to wait with their older daughter for the school bus to arrive. *Id.*

Mr. William Freeman, an emergency medical technician, testified that the ambulance arrived eleven minutes after he received the emergency call and that the victim was at that time obviously lifeless. *Id.* at *1. He stated that the Petitioner was hysterical, that Mr. Nelson had to be restrained because he thought emergency personnel should have arrived sooner, and that neither the Petitioner nor Mr. Nelson came to the ambulance to check on the victim. *Id.* He testified that the Petitioner and Mr. Nelson went to a car with relatives and were smoking and laughing as though nothing had happened. *Id.* The Petitioner and Mr. Nelson denied this. The Petitioner testified that she did not ask to see the victim because she did not want to interrupt any lifesaving measures. *Id.* at *21. She also testified that she was distraught when the victim died, and she denied smoking and laughing with Mr. Nelson. *Id.* at *19. Mr. Nelson testified that he did ask to see the victim in the ambulance, and he denied laughing and smoking after the victim's death. *Id.* at *14.

Sheriff Steve Sanders testified that the Petitioner told him that she had placed the victim on a mattress on the floor with a bottle and had walked away. *Id.* at *2. The Petitioner told him that the victim was unresponsive when she returned and that Mr. Nelson called 911. *Id.* Sheriff Sanders testified that both the Petitioner and Mr. Nelson were "calm." *Id.* The Petitioner denied having told Sheriff Sanders that the victim stopped breathing on the mattress. *Id.* at *21. Instead, she reiterated that the victim died while the Petitioner was waiting for the bus with her older daughter. *Id.* at *21.

- 4 -

After the victim's death, Mr. Nelson gave a statement to police noting that R.C. had pushed down the Petitioner while she was holding the victim and that the victim hit her head. *Id.* at *10. He also stated that his brother, the victim's uncle, was left alone with the baby and that the baby started to cry. *Id.* In her statement to police, the Petitioner explained the victim's injuries by stating that she was knocked down by R.C. while holding the victim, that she accidentally bumped the victim's head on a doorknob, that R.C. and his sister were throwing things at the baby, and that she once left the baby with Mr. Nelson's brother while she did laundry. *Id.* Investigator Joe Pursell testified that the Petitioner and Mr. Nelson cried at the hospital on the day of the victim's death but showed no emotion thereafter. *Id.*

A medical examiner for Shelby County, Dr. Miguel Laboy, testified about the victim's numerous injuries. The victim had an abrasion on her nose and a bruise under her jaw, which he testified was unusual in an infant because it is a protected area. *Id.* at *2. He acknowledged that administering CPR could cause bruising. *Id.* at *3. Dr. Laboy found three hemorrhages under the victim's skull, and he testified that they were caused by older as well as more recent injuries. *Id.* at *2. He concluded that the hemorrhages were from trauma. *Id.* at *3. He likewise found perioptic hemorrhages and a retinal hemorrhage that were the result of trauma. *Id.* The victim had six fractured ribs on the left lateral side, eight on the left posterior side, and five on the right lateral side. *Id.* He stated that these fractures were healing with calluses and that there was a recent refracture of one left posterior rib with blood accumulation. *Id.* The fractures, except for the most recent refracture, could have resulted from a single event. *3. The injuries were consistent with "squeezing type of inflicted trauma." *Id.* at *3. Dr. Laboy did not discount the possibility that the multiple rib fractures could have occurred if someone holding the victim fell. *Id.* at *4. The victim was suffering from recent pneumonia. *Id.* Dr. Laboy testified that in his opinion, the victim died of a closed head injury that involved new bleeding over an older brain injury. *Id.* He acknowledged that the victim's internal injuries would not be visible to the Petitioner. *Id.* at *4.

Mr. Nelson's stepmother testified that the Petitioner and Mr. Nelson were both crying immediately after the victim's death and that they were not laughing. *Id.* at *14. She testified that she had taken care of the victim in late April, and the victim slept for most of the three-hour visit. *Id.* at *15. Mr. Nelson's stepmother had difficulty waking the victim to feed her, and the victim began crying continuously and simply would not stop. *Id.* Mr. Nelson's stepmother felt that the crying was excessive and abnormal. *Id.*

Jeremy Booker, a jailhouse informant, testified that he witnessed Mr. Nelson speaking with a gray-haired man in a suit and that he heard Mr. Nelson say that he hit, slapped, and kicked the victim because she was crying while he wanted to sleep. *Id.* at *11. The man Mr. Nelson was allegedly speaking with was not identified, and Mr.

- 5 -

Booker was cross-examined about inconsistent statements he had made regarding the timing of Mr. Nelson's alleged confession. *Id.* An attorney who did not have gray hair testified that he met with Mr. Nelson about unrelated matters around the time of the alleged confession and that Mr. Nelson did not say anything about injuring the victim. *Id.* at *12. Mr. Nelson denied making the statements. *Id.*

The Petitioner presented the testimony of Dr. Fred Steinberg, a forensic psychologist. Dr. Steinberg testified that the Petitioner had an IQ of 53, which indicated that she "would have the intellect of a first or second grade child." *Id.* at *15. He testified that the Petitioner, in her statement to police, gave different answers to how the victim was injured because she was either unaware of the reason or she wanted to give the interviewer an answer that the interviewer would accept. *Id.* at *15-16. The Petitioner had been diagnosed with psychosis prior to the victim's death, and she suffered hallucinations. *Id.* at *16-17. He testified that the Petitioner would not be able to appreciate consequences and that she would not be the one to make decisions in a relationship. *Id.* at *16.

Dr. Steinberg testified that the Petitioner was nevertheless competent to stand trial based on the "Evaluation of Competency to Stand Trial – Revised," which consisted of a structured interview. He explained that determining competency is "based upon several things, understanding how the court works, and if you're not understanding it, being able to retain it, being educated and retain[ing] it; working with your lawyer; having an understanding of the charges against you; and so on and so forth." *Id.* at *17. He testified that the Petitioner understood the difference between right and wrong. *Id.*

The jury convicted both the Petitioner and Mr. Nelson of first degree felony murder and of aggravated child abuse. The Petitioner was sentenced to life in prison for the murder conviction and to fifteen years for the aggravated child abuse conviction. *Id.* at *1. Due to an untimely notice of appeal, this court reviewed only the sufficiency of the evidence on direct appeal. *Id.* at *22. The Petitioner's convictions were affirmed. *Id.* at *29.

**Post-Conviction Proceedings**

The Petitioner filed a timely petition for post-conviction relief, and she was appointed counsel. At the post-conviction hearing, the Petitioner testified that she graduated from high school but that all of her classes, save a home economics class, were special education classes. She could write and read "a little bit." She was given instructions on caring for the victim prior to the victim's release from the hospital. The Petitioner testified that the victim was diagnosed with intellectual disabilities and other medical problems, including a heart condition. At the time of her death, the victim was

- 6 -

on prescription antibiotics and taking formula, and she was experiencing a reaction to the antibiotics. The Petitioner stated that the victim had a seizure on the night before she died. She also testified that the appearance of blood clots in the brain "runs in the family on both sides."

The Petitioner testified that trial counsel did not call her mother as a witness. She acknowledged that her mother did not live nearby and could not have testified regarding the victim or facts of the case. The Petitioner stated that she had wanted to testify at trial and that she did not want her trial severed from Mr. Nelson's trial. She acknowledged that trial counsel cross-examined Mr. Booker about Mr. Nelson's alleged jailhouse confession. She testified, however, that she felt trial counsel did not adequately research and prepare and that he should have "got down into the case, read by page by page." She testified that trial counsel conveyed plea offers to her but that she was scared to take the offers.

Trial counsel testified that he was the second attorney to represent the Petitioner. The Petitioner's first attorney had retained Dr. Steinberg and another expert witness. However, the other expert witness, who has since been "suspended," "dropped off the face of the earth," and trial counsel's numerous attempts to contact him failed. Trial counsel instead hired a pediatric nurse who spent over twenty hours helping him to understand the medical proof. Trial counsel testified that he met with the Petitioner several times but that the Petitioner would "get stuck in a loop" and begin to repeat the same thought over and over, making a prolonged meeting useless.

Trial counsel testified that when he tried to discuss the medical proof with the Petitioner, she would repeat over and over that she wanted to know what had happened to cause the death of her child. Trial counsel attempted to locate an expert pathologist to counter Dr. Laboy's testimony but was unable to do so because Dr. Laboy was affiliated with a large medical group. He testified that he wished he "would have done more" to counter the medical testimony by securing an expert pathologist. He acknowledged that another pathologist might have agreed with Dr. Laboy's conclusions. Trial counsel introduced the victim's medical records at trial in an effort to imply that her injuries may have been perinatal. The Petitioner never told trial counsel that the victim had a seizure the night before she died. Trial counsel testified that the Petitioner's mother could not have given testimony regarding the facts of the case and could only have given "social context."

Trial counsel testified that this was a case that caused him to second-guess his actions and that at the time of trial,

I focused on her competency to stand trial. And what I did not do was ask Dr. Steinberg to assist me in evaluating whether she was competent to assist me in her defense. I mentioned to [the prosecutor] that we would get stuck [i]n these loops. No, I did not have Dr. Steinberg evaluate whether she was competent to assist me at trial.

Trial counsel testified that if it had occurred to him, he would have had the Petitioner evaluated to determine her capability in assisting in her own defense. He acknowledged that Dr. Steinberg found the Petitioner competent to stand trial and that Dr. Steinberg testified in detail regarding her ability to process and communicate.

Trial counsel testified that whenever he approached the Petitioner with a plea offer, she would again "hit another one of those loops," repeating over and over that she did not want to go to prison. The State extended a three-year plea offer with the possibility of alternative sentencing, but trial counsel could not promise the Petitioner she would not go to jail, and she consequently refused the offer.

Trial counsel considered filing a motion to sever the Petitioner's trial from Mr. Nelson's trial. He testified that he made a strategic decision not to do so because he felt the jury would want to hold someone accountable for the victim's death and he believed that the jury was more likely to acquit the Petitioner if they had the option of returning a conviction for Mr. Nelson at the same time.

Trial counsel stated that he tried to counter the testimony that the Petitioner did not manifest emotion on the victim's death. He noted that anyone who had observed the Petitioner "would understand that her emotion doesn't run like you would normally expect someone's emotion" to run and that Dr. Steinberg testified about the Petitioner's affect.

The post-conviction court found that the Petitioner did not establish either that trial counsel was deficient or that any deficiency was prejudicial, and it denied the petition for post-conviction relief.

## ANALYSIS

On appeal, the Petitioner asserts that her trial counsel performed deficiently in failing to investigate the medical proof or call witnesses, failing to move for a severance, failing to properly cross-examine witnesses, and failing to have the Petitioner's ability to assist in her own defense evaluated. The State responds that the Petitioner has not shown deficiency and prejudice for any of her claims.

- 8 -

A post-conviction petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. T.C.A. § 40-30-103. The petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f); *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward*, 315 S.W.3d at 465. This court may not substitute its own inferences for those drawn by the post-conviction court, and questions concerning the credibility of witnesses, the weight and value of the evidence, and the factual issues raised by the evidence are resolved by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). A claim of ineffective assistance of counsel raises a mixed question of law and fact which this court reviews de novo. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The trial court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *Id.*

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to counsel. This right has been defined as the right to the reasonably effective assistance of counsel, or assistance "'within the range of competence demanded of attorneys in criminal cases.'" *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). The overall standard of effectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance.'" *Id.* (quoting *Burns*, 6 S.W.3d 453 at 462. In evaluating counsel's performance, strategic choices "'made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff*, 297 S.W.3d at 216. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Honeycutt*, 54 S.W.3d at 768 (quoting *Strickland*, 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316. Because both prongs must be established for relief, a court need not address both if the defendant has failed to prove either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## A. Failure to Investigate and to Call Witnesses

The Petitioner contends that trial counsel did not adequately investigate her case. She notes in particular that an expert pathologist might have disputed the medical evidence at trial. The Petitioner cites to trial counsel's own testimony that he felt he should have secured an expert pathologist to attempt to dispute the medical proof. The Petitioner also testified that trial counsel did not call her mother to testify.

Trial counsel testified that he spent over twenty hours reviewing the medical proof with a pediatric nurse, that he presented the expert testimony of Dr. Steinberg, and that he attempted to locate a pathologist to testify for the Petitioner but was stymied by Dr. Laboy's affiliation with a large medical group. He testified that in retrospect, he should have tried harder to find his own expert pathologist.

When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Pylant*, 263 S.W.3d at 869 (quoting

*Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Pylant*, 263 S.W.3d at 869-70.

Here, the Petitioner did not present the testimony of either her mother or an expert pathologist who disputed the medical proof at trial. Trial counsel testified that he attempted to secure a pathologist but that he was unable to do so because Dr. Laboy was affiliated with a large medical group. He put considerable effort into reviewing and understanding the medical proof. We conclude that the Petitioner has not shown deficiency or prejudice.

## B. Failure to Move for Severance

The Petitioner asserts that trial counsel was deficient in failing to move for a severance. At the post-conviction hearing, trial counsel testified that he considered moving for a severance but thought it would be in the Petitioner's best interest to be tried together with Mr. Nelson. Trial counsel noted that the jury would want to hold someone accountable for the victim's death, and he felt that the jury would be more likely to blame Mr. Nelson than to blame the Petitioner if the two were tried together. Accordingly, the decision not to move for a severance was a strategic decision, and strategic decisions, when made after a thorough investigation, are "virtually unchallengeable." *Felts*, 354 S.W.3d at 277. The Petitioner has furthermore failed to present any argument that a motion to sever would have been granted. *See Jesse Wade Glover v. State*, No. W2010-01679-CCA-R3-PC, 2012 WL 12932004, at *4 (Tenn. Crim. App. June 6, 2012) (denying relief for alleged deficiency in failing to ask for severance when the petitioner did "not offer any evidence to support that a severance in this case would have been proper"); *Black*, 794 S.W.2d at 758 (denying post-conviction relief for failure to file severance when there existed "neither factual nor legal basis for the granting of a severance"). She is not entitled to relief.

## C. Inadequate Cross-Examination

The Petitioner asserts that trial counsel was deficient in insufficiently disputing testimony that she showed no emotion on her daughter's death. While she does not identify the exact testimony at issue, Mr. Freeman testified that the Petitioner was hysterical at first but later seemed unconcerned about the victim's death, Sheriff Sanders testified that the Nelsons were "calm," and Investigator Pursell testified that the Petitioner cried at the hospital but showed no emotion thereafter. The Petitioner, Mr. Nelson, and Mr. Nelson's stepmother all testified that the Petitioner was crying and upset and not laughing at the time of the victim's death. Trial counsel cross-examined Mr.

Freeman regarding his statement that the Petitioner was "hysterical," and he confirmed that she was "very agitated." The Petitioner does not specify how trial counsel could have further discredited the testimony regarding her emotional state. Trial counsel testified that he did not believe the testimony was particularly important because anyone observing the Petitioner would conclude that her emotional responses might be unusual due to her mental limitations. Trial counsel presented proof tending to counter the prosecution's evidence that the Petitioner was unemotional, and we conclude that the Petitioner has not established either deficiency or prejudice. See *Tony Young v. State*, No. W2007-00328-CCA-R3-PC, 2009 WL 5083498, at *6 (Tenn. Crim. App. Dec. 28, 2009) (holding that trial counsel's performance in cross-examining victims was not deficient when trial counsel questioned the victims and presented other witnesses to rebut their testimony).

### D. Failure to Evaluate the Petitioner to Determine her Ability to Assist in her Defense

The Petitioner contends that trial counsel was deficient in not having her ability to assist in her defense evaluated. Trial counsel testified that, in hindsight, he felt he should have asked Dr. Steinberg to evaluate the Petitioner's ability to assist in her own defense. He noted that the Petitioner refused a three-year plea offer which might have included alternative sentencing. He felt that the Petitioner's refusal was not logical but that she was "stuck in a loop" where the only thought in her head was that she wanted to avoid prison entirely. Evidence at trial established that the Petitioner had an IQ of 53 and functioned at the level of a first or second grade child.

Under the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution, a person who is mentally incompetent may not be put on trial. *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000). The standard for determining competency to stand trial is whether the accused has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *Id.* (quoting *State v. Black,* 815 S.W.2d 166, 174 (Tenn. 1991)). The defendant bears the burden of establishing incompetency by a preponderance of the evidence. *State v. Reid*, 164 S.W.3d 286, 307 (Tenn. 2005).

At trial, Dr. Steinberg testified that he evaluated the Petitioner for competency and that he found her competent to stand trial. He explained that the evaluation was based in part on the patient's ability to "work[] with [her] lawyer." Dr. Steinberg concluded that the Petitioner was "able to do that" based on a standard competency test which utilized a structured interview. The post-conviction court found that the issue of the Petitioner's ability to assist in her defense was "brought up at trial and a doctor testified that she was able to stand trial."

- 12 -

While trial counsel's testimony supports the conclusion that the Petitioner's ability to assist in her own defense was impaired, the question presented in this post-conviction case is whether trial counsel performed deficiently in failing to obtain further psychological testing of the victim. The record as a whole establishes that Dr. Steinberg did in fact consider the Petitioner's ability to work with trial counsel and that in Dr. Steinberg's expert opinion, she met the medical criteria for competency, including the ability to consult with counsel and assist in her defense. *See Blackstock*, 19 S.W.3d at 205-06 (concluding that the defendant, who had an IQ of 55, was competent to stand trial). Furthermore, without expert testimony showing that the Petitioner was, in fact, not competent to assist with her own defense, the Petitioner cannot establish prejudice. Accordingly, we affirm the denial of post-conviction relief.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE